IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ATLAS ULUSLARARASI KUMANYACILIK TIC A.Ş et al.,<br><br>Plaintiffs/Intervening Plaintiffs,<br>v.<br><br>M/V ARICA, IMO 9399741, its engines, tackle and apparel, et al.,<br><br>Defendants. | Civil Action No. 20-679-RGA<br><br>IN ADMIRALTY, Rule 9(h) |

MEMORANDUM

Before me are Deutsche Calpam GmbH ("Calpam")'s Motion to Disburse Registry Funds (D.I. 100); Bank of America Europe D.A.C. ("BOA")'s Motion for Summary Judgment on Priorities of Claims and Order for Return of Deposit (D.I. 102); and Atlas Uluslararasi Kumanyacılık tic A.Ş and Atlas Gemi Vanalari ve Ekipmanlari Tic Ltd Sti (together, "Atlas")'s Motion for Entry of Summary Judgment Pursuant to Fed. R. Civ. P. 56 (D.I. 103). These motions relate to the disbursement of the funds in the Court's registry. I have reviewed the parties' briefing. (D.I. 101, 102, 104, 106, 107, 108, 111, 112, 113).

On May 19, 2020, Atlas brought this action against M/V ARICA, IMO 9399741 ("the Vessel"), *in rem*, and against FS Arica, Ltd., *in personam*, for FS Arica's failure to pay for the maritime necessaries Atlas provided to the Vessel. (D.I. 1). On May 22, 2020, Calpam intervened as a co-plaintiff for the non-payment of an invoice for bunkers (fuel) supplied to the Vessel. (D.I. 20, 42). On July 6, 2020, BOA intervened as a co-

1

plaintiff, seeking to foreclose on its Liberian preferred ship mortgage over the Vessel. (D.I. 56, 75).[1]  I have entered default judgments for Atlas's, Calpam's, and BOA's respective claims.  (D.I. 62, 84, 99).[2]

BOA's nominee bought the Vessel on a credit bid of $6.5 million.  (D.I. 68).  In consideration of the credit bid, BOA deposited $480,263.72 into the Court's registry to "guarantee the payment of all claims or liens on the [Vessel], if any, which shall be held by the Court to be superior to [BOA]'s claim."  (D.I. 61).[3]  As of March 10, 2022, the Court's registry has an account balance of $605,672.61.

Atlas and Calpam ask this Court to order the payment of their maritime liens from the Court's registry.  (D.I. 101 at 7; D.I. 104 at 12).  BOA asks this Court to order the return of its registry deposit.  (D.I. 102 at 9).  Thus, the sole issue before the Court is the priority of the parties' claims.

## I. DISCUSSION

There is no dispute that BOA has a valid preferred ship mortgage on the Vessel, which has priority over Atlas's and Calpam's maritime liens.[4]  Atlas and Calpam argue,

---

[1] Network Shipping Limited also intervened as a co-plaintiff.  Network's claim was dismissed on January 28, 2021.  (D.I. 93).
[2] Atlas obtained a judgment of $100,051.59.  (D.I. 62).  Calpam obtained a judgment of $151,573.85, plus interest at the rate of 10 percent per annum running from May 20, 2020, until the judgment is satisfied, along with costs.  (D.I. 84).  BOA obtained a judgment of $16,198,373.58, plus interest accrued from June 29, 2020, until the judgment is satisfied, along with costs.  (D.I. 99).
[3] BOA also deposited $125,000 as an "earnest money deposit" through the U.S. Marshals Service.  (D.I. 36, ¶ 3; D.I. 61).
[4] Pursuant to the U.S. Ship Mortgage Act, "[T]he preferred mortgage lien, including a preferred mortgage lien on a foreign vessel whose mortgage has been guaranteed under chapter 537 of this title, has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred

2

however, that this Court should equitably subordinate BOA's mortgage claim. Calpam alternatively argues that the bunkers it supplied were never the vessel owner's property and thus were never subject to BOA's mortgage. I will address each argument in turn.

### A. Equitable Subordination

Originally developed in bankruptcy law, the doctrine of equitable subordination permits the court, in the exercise of its equitable powers, to subordinate a superior ranking lien to a junior lien based on the inequitable conduct of the superior lien holder. *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d 259, 263 (9th Cir. 1988). It is well-established that courts may apply the doctrine of equitable subordination in admiralty cases. *Id.*; *Custom Fuel Servs., Inc. v. Lombas Indus., Inc.*, 805 F.2d 561, 566 (5th Cir. 1986).

To justify the equitable subordination of an otherwise valid claim, the movant must show: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the law. *Custom Fuel Servs.*, 805 F.2d at 566. "Three types of inequitable conduct are sufficient to warrant subordination: '(1) fraud, illegality, breach

---

maritime liens)." 46 U.S.C. § 31326(b)(1). The U.S. Ship Mortgage Act defines "preferred mortgage" as "a mortgage, hypothecation, or similar charge that is established as a security on a foreign vessel if the mortgage, hypothecation, or similar charge was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office." 46 U.S.C. § 31301(6)(B). Atlas and Calpam do not dispute that BOA followed the necessary procedures to obtain a preferred mortgage under § 31301(6)(B).

3

of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" *Id.*

As a preliminary matter, BOA argues, "The 'prerequisite' to the first prong of the [equitable subordination] test is 'a showing that the claimant is in a position of control over the debtor.'" (D.I. 107 at 3 (quoting *Custom Fuel Servs.*, 805 F.2d at 566)). Atlas does not address this argument, and Calpam responds that BOA did have control over FS Arica because it froze FS Arica's bank accounts in April 2020. (D.I. 112 at 5).

I do not think that BOA's freezing of FS Arica's bank account upon default rises to the level of control required by *Custom Fuel*. There, the "control" prong was satisfied because the mortgagee "own[ed] all [the mortgagor's] stock and control[ed] its board of directors" and caused its subsidiary to grant the mortgage. *Custom Fuel Servs.*, 805 F.2d at 566. In contrast, BOA does not appear to have any control over FS Arica's business and did not control the form of the mortgage. BOA was instead simply exercising its contractual rights as a holder of a preferred mortgage lien, which it obtained through an arms-length transaction. Thus, Calpam and Atlas have failed to show that BOA was in a position of control over FS Arica, precluding a finding of equitable subordination. If *Custom Fuel* correctly states Third Circuit law, as the parties assume, that would be the end of the analysis.[5]

---

[5] There are no Third Circuit admiralty cases applying equitable subordination, so it is unclear whether the Third Circuit would adopt such a requirement. The Third Circuit, however, does not require a showing of control as a prerequisite to equitable subordination in bankruptcy cases. "The type of misconduct that will satisfy the first prong [of the equitable subordination test] varies depending on whether the alleged bad actor is an 'insider' of the debtor." *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 81 (Bankr. D. Del. 2014). "If the claimant is not an insider, then evidence of more

4

Nevertheless, I continue. Even if I were to find that BOA was in a position of control over the debtor, Atlas and Calpam would still have failed to show that BOA engaged in inequitable conduct, which is required for the application of equitable subordination.

Atlas and Calpam point to three instances of BOA's "inequitable conduct." First, they assert that BOA and its predecessor Norddeutsche Landesbank Girozentrale ("Nord/LB") failed to timely declare default. Specifically, on December 31, 2018, FS Arica breached the minimum liquidity covenant of the loan agreement. (D.I. 104-1, Ex. B). Nord/LB "tolerated" this breach and did not declare default. (*Id.*, Ex. A at 16:17–25). BOA knew FS Arica was in default when it purchased the mortgage from Nord/LB on March 2, 2020. (*Id.*, Ex. A at 13:24–14:15). BOA, however, did not issue a notice of default on the mortgage until April 17, 2020, after FS Arica failed to make a payment. (*Id.*, Ex. B). Atlas and Calpam argue that BOA's and Nord/LB's conduct was inequitable because they "knowingly permitted an insolvent FS Arica to continue accruing debts which [BOA] and Nord/LB knew, by way of the minimum liquidity breach, FS Arica could not pay." (D.I. 104 at 11).

---

egregious conduct such as fraud, spoliation or overreaching is necessary." *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (quoting *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)) (cleaned up). Even if I were to apply Third Circuit bankruptcy law to this admiralty claim, I would reach the same result—no equitable subordination. BOA is not an insider of FS Arica; thus, "more egregious conduct" is required to support a finding of equitable subordination. As I discuss *infra*, Atlas and Calpam have failed to show that BOA engaged in inequitable conduct, let alone "more egregious conduct."

In support, Atlas cites *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F. Supp. 171 (W.D. La. 1985), *aff'd on other grounds*, 802 F.2d 160 (5th Cir. 1986). In *Cantieri*, the district court equitably subordinated the preferred ship mortgage because the mortgagee knew the mortgagor was in default yet waited two years to foreclose. *Id.* at 187. The district court reasoned that since the mortgagee's agent shared office space with the mortgagor and monitored its financial statements, the mortgagee "was close enough to the action to hear the financial wolves at [the mortgagor's] door, yet continued to allow the vessel and its operators to slip further into debt." *Id.*

In this case, however, there is no evidence that BOA had this high degree of intimacy with FS Arica or that it could "hear the financial wolves" at FS Arica's door. Instead, BOA's corporate representative testified that BOA had "no reasons to believe [when it acquired the loan] that the borrower would have significant unpaid amounts to suppliers other than in the ordinary course of business," because "the borrower was in compliance with the repayment schedule of the loan," and "the vessels . . . were earning and were chartered amounts that should have been capable of covering normal operating expenses of vessels of this type." (D.I. 104-1, Ex. A at 18:22–19:10). Thus, *Cantieri* is not applicable here. *See Key Bank of Puget Sound v. Alaskan Harvester*, 738 F. Supp. 398, 403 (W.D. Wash. 1989) (declining to follow *Cantieri* where "only six months elapsed between the first scheduled payment and the declaration of default" and "no evidence [was] offered . . . approximating the degree of intimacy between the mortgagee and the mortgagor that impressed the court in *Cantieri*").

Atlas and Calpam also cite *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515 (2d Cir. 1979). In *Gulf Oil*, the mortgagee Chase knew that the mortgagor was in default of payment. *Id.* at 519. Instead of foreclosing on the vessels, "Chase lured Gulf into supplying the bunkers on credit when Chase knew that the vessels had no cash." *Id.* at 520. Chase then directed the vessels to move to a more desirable location, using the bunkers supplied by Gulf. *Id.* at 519. The Court equitably subordinated Chase's mortgage, holding, "Chase was unjustly enriched, for without the bunkers the vessels could not have sailed away to avoid a foreclosure in the United States that would have imperiled Chase's priority over suppliers." *Id.*

The conduct in *Gulf Oil* was far more egregious than BOA's conduct here. The mortgagee in *Gulf Oil* intentionally improved its own position at the expense of other creditors. It had express knowledge that the mortgagor could not pay for the bunkers but still accepted them so that it could move the vessel. In contrast, BOA did not have any reason to believe that FS Arica was unable to pay Atlas and Calpam. (D.I. 104-1, Ex. A at 18:22–19:10). Additionally, the only potential benefit that BOA received from Atlas's and Calpam's provision of maritime necessaries and bunkers was in the form of loan payments. This "benefit" does not compare to Chase's direct use of Gulf's bunkers to travel to another country to avoid the foreclosure by other creditors.

FS Arica's breach of the minimum liquidity covenant was a "technical default," not a payment default. FS Arica was still "in compliance with the repayment schedule of the loan." (*Id.* at 19:2–3). When FS Arica first defaulted on a payment on April 14, 2020, BOA issued a notice of default within three days. (*Id.*, Ex. B). I do not think that

7

BOA and Nord/LB's decision not to call default on a loan due to a technical covenant breach, when the borrower was still making payments, was unreasonable. *See Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1233, 1238 (11th Cir. 2006) ("The postponement of a declaration of default on a loan for a reasonable period of time, by itself, is insufficient to warrant equitable subordination of the Banks' preferred ship mortgage."). There does not seem to be any reason for a creditor to go through the steps of foreclosure when it is still receiving payments from the borrower. This conduct certainly does not rise to the level of egregious misconduct which has warranted equitable subordination in other cases.[6] *See, e.g.*, *Branch Banking & Tr. Co. of Va. v. M/Y Beowulf*, 883 F. Supp. 2d 1199, 1218–19 (S.D. Fla. 2012) (applying doctrine of equitable subordination where mortgagee granted mortgagor a five-year extension even though mortgagor "had just defaulted on a $ 800,000 balloon payment, presented with a stunning debt-to-income ratio of 157%, reported an $11 million decrease in net worth, and was besieged with tax liens").

Second, Atlas and Calpam point to the "blocking order" issued by BOA on April 17, 2020. This blocking order froze FS Arica's bank account and required FS Arica to

---

[6] Atlas also suggests that FS Arica's violation of the minimum liquidity covenant shows undercapitalization. (D.I 104 at 10; D.I. 113 at 2). "Capitalization is inadequate if in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized," or if "at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source." *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 703 (5th Cir. 1977); *Yasi v. M/V Horizon's Edge*, 2015 WL 3454718, at *6 (D. Mass. May 29, 2015). Atlas fails to make any argument showing that this standard is met and instead makes vague references to "undercapitalization." Thus, I do not find any showing of undercapitalization.

obtain BOA's "prior written consent" before paying debts. (D.I. 101-2, Ex. 2). Atlas and Calpam argue that this blocking order prevented FS Arica from paying them, while BOA likely took that money to pay its mortgage. (D.I. 101 at 7; D.I. 113 at 6).

I decline to subordinate BOA's claim on this basis. Atlas and Calpam do not cite any case where the court has equitably subordinated a mortgage based on a mortgagee's freeze of the mortgagor's bank account. BOA froze FS Arica's bank account after FS Arica defaulted on a payment. This action was justifiable to protect BOA's security interest, and there is no evidence suggesting that BOA froze FS Arica's accounts for any other purpose. *See Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 558–59 (10th Cir. 1993) (affirming the district court's dismissal of an equitable subordination claim "based upon allegations that [the mortgagee] froze debtor's checking accounts and offset the amount of those accounts against debts owed to [the mortgagee]" and finding that the mortgagee "took appropriate, justifiable actions to protect its security interest").

Third, Atlas argues that BOA was "unjustly enriched" at the expense of Atlas and Calpam. (D.I. 104 at 10–11). Sometime after BOA issued a notice of default, it foreclosed on the mortgage not only of the Vessel but also on mortgages on four other vessels. BOA then privately sold the vessels and re-mortgaged the vessels to new buyers for $76,648,760.57 around October 2020. (D.I. 104-1, Exs. C–E). When BOA intervened in this action in July 2020, $38,692,675.58 of its original mortgage was overdue. (D.I. 56 at ¶ 24). Atlas argues that BOA would not have been able to re-mortgage the vessels for nearly twice the amount in the original, intervening complaint

9

without Atlas and Calpam supplying the maritime necessaries which kept the Vessel in operation. (D.I. 104 at 11). Thus, BOA received a "200% windfall" at the expense of Atlas and Calpam. (*Id.*).

BOA responds that its re-mortgage of the vessels does not constitute a "windfall" because BOA advanced new funds to new borrowers. (D.I. 107 at 14–15). Specifically, it financed the acquisition of the cross-collateralized vessels and financed their operation, maintenance, and repair. (*Id.*; *see also* D.I. 107-4, Ex. 4).

Atlas fails to show that BOA's re-mortgage of the vessels rises to level of "sham transaction" sufficient to justify equitable subordination here. *TMF Tr. Ltd. v. Monjasa Ltd.*, 799 F. App'x 559, 560 (9th Cir. 2020) (declining equitable subordination argument because the movant did not provide any evidence that "the financial transaction was a sham" (quoting *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d 259, 263 (9th Cir. 1988))); *Off. Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 298 (Bankr. D. Del. 2018) ("Equitable subordination is 'an extraordinary remedy which is applied sparingly.'" (internal citation omitted)). It is not inequitable for BOA to obtain a new mortgage after advancing new funds to new borrowers. Further, it seems speculative that this re-mortgage would not have been possible without Atlas providing maritime necessaries, especially because BOA provided funds to support the Vessel's operation.

Because Atlas and Calpam have failed to show that BOA engaged in inequitable conduct, I decline to apply the doctrine of equitable subordination to BOA's preferred ship mortgage.

### B. Calpam's Retention of Title to the Bunkers

Calpam alternatively argues that the bunkers it supplied were never the vessel owner's property and thus were never subject to BOA's mortgage. (D.I. 101 at 5–6). On April 16, 2020, NSC Shipping GmbH & Cie. KG, acting on behalf of FS Arica, placed an order for bunkers to be delivered to the Vessel in Jamaica. (D.I. 101-1, Ex. 1, ¶ 2). In response to this order, Calpam sent NSC a copy of its standard terms and conditions. (*Id.*). Calpam's terms and conditions contain a retention-of-title provision, which provides:

> Title to the Marine Fuels shall pass to the Buyer upon full payment for the Marine Fuels delivered, pursuant to the terms of clause 8 (Payment) hereof. Until such time as payment is made in full, the Buyer agrees that it is in possession of the Marine Fuels solely as bailee for the Seller.

(*Id.*, Ex. B to Ex. 1, § 10(b)). Calpam argues that since FS Arica never paid for the bunkers, it never obtained title to the bunkers under this retention-of-title provision.

Calpam's terms and conditions contain a choice-of-law clause, which provides:

> This agreement and all agreement (sic) subject to these GTC shall be governed exclusively by the substantive laws of the Federal Republic of Germany (to the exclusion of the Convention for the International Sale of Goods and the conflict of law provisions).

(*Id.*, § 20(a)). Both parties agree that, under this choice-of-law clause, German law governs the bunker-supply agreement between Calpam and FS Arica. The parties dispute, however, whether German conflict-of-law rules apply. Dr. Volker Kammel, who submitted a declaration on behalf of BOA, states, "The conflict rules applicable in Germany . . . are mandatory provisions and cannot be excluded by an agreement of the parties." (D.I. 107-7, Ex. 7, ¶ 15 (citing Art. 3 Rome I Regulation, margin no. 52)). Dr.

11

Philipp Drömann, who submitted a declaration on behalf of Calpam, does not respond to this point. (*See* D.I. 101-3, Ex. 3; D.I. 108-1, Ex. 1). Because Dr. Kammel is the only German attorney to opine on the applicability of Germany's conflict-of-law rules, I will accept his declaration and apply these mandatory rules.

Dr. Kammel explains that under German conflict-of-law rules, "Interests in property are governed by the law of the State in which the property is situated." (D.I. 107-7, Ex. 7, ¶ 17 (quoting English translation of Article 43 para 1 of the Introductory Act to the German Civil Code)). The Vessel was seized in Delaware and the proceeds of its sale are in this Court's registry. Thus, under German conflict-of-law rules, Delaware law governs the rights *in rem* to the Vessel and its proceeds.

Under Delaware's Uniform Commercial Code, which applies to transactions in goods (such as bunkers), "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." DEL. CODE ANN. tit. 6, § 2-401(1). In other words, once the goods have been delivered to the buyer, any retention-of-title provision only allows the seller to claim a security interest in the goods. *In re Aleris Int'l, Inc.*, 456 B.R. 35, 42 (Bankr. D. Del. 2011). Thus, Calpam simply has a security interest in the bunkers, which is junior to BOA's mortgage. 46 U.S.C. § 31326(b).

Calpam also argues that to the extent that the Vessel consumed the bunkers before its interlocutory sale at auction (D.I. 68), the Vessel committed the tort of conversion by appropriating property that belonged to Calpam. Under the U.S. Ship Mortgage Act, the conversion of property gives rise to a preferred maritime lien which has priority over a

12

preferred mortgage lien (like BOA's). 46 U.S.C. §§ 31301(5)(B), 31326(b)(1). Calpam's argument fails, however, because Calpam did not retain title to the bunkers under Delaware law—it only retained a security interest in the bunkers.

Even if Calpam were to have retained title to the bunkers, I do not think it would have had a valid maritime conversion claim due to any consumption of the bunkers. *See, e.g.*, *ING Bank N.V. v. M/V Temara*, 203 F. Supp. 3d 355, 369 (S.D.N.Y. 2016) (rejecting a similar trespass/conversion argument because "there was nothing wrongful or unauthorized in the [buyer's] exercise of dominion or control over the fuel oil. In consuming the fuel oil, [the buyer] did what [the seller] expected it to do." (internal citation omitted)).

Thus, BOA's mortgage is superior to Calpam's and Atlas's maritime liens. Because BOA's claim—$16,198,373.58 plus interest (D.I. 99)—is greater than its credit bid—$6.5 million (D.I. 68)—BOA is entitled to the full return of its deposits now in the Court's registry.

## II. CONCLUSION

An appropriate order will issue.

Entered this 11 day of March, 2022.

Richard G. Andrews
United States District Judge